# United States Court of Appeals

## For the First Circuit

No. 01-1643

ROBERT HOWARD,

Plaintiff, Appellee,

v.

SUSAN ANTILLA,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Steven J. McAuliffe, U.S. District Judge]

---

Before

Torruella and Lipez, Circuit Judges,

and Saris,[*] District Judge.

---

Jonathan M. Albano, with whom Bingham Dana LLP, William L. Chapman and Orr & Reno were on brief, for appellant.
Robert A. Bertsche, Zick Rubin, Stuart Svonkin and Hill & Barlow were on brief, for amici curiae in support of appellant.
Charles G. Douglas, III, with whom C. Kevin Leonard, V. Richards Ward, Jr. and Douglas, Leonard & Garvey, P.C. were on brief, for appellee.

---

June 28, 2002

---

[*] Of the District of Massachusetts, sitting by designation.

**TORRUELLA**, <u>Circuit Judge</u>.  The plaintiff, chairman of a publicly-traded company, brought suit against the defendant, a newspaper reporter, for defamation and false light invasion of privacy.  At the end of the trial, the jury returned a sizeable verdict in favor of the plaintiff on his claim for false light invasion of privacy, but a take-nothing verdict on the defamation claim.  For the reasons stated below, we vacate the jury's verdict on the false light claim and order an entry of judgment in favor of the defendant.

## I.

Defendant-appellant Susan Antilla ("Antilla") was a business reporter for The New York Times ("The Times"), where her writing focused mostly on explaining the financial world to the average investor.  At the time of the events in this case, Antilla had approximately 18 years of experience reporting on business news for a variety of publications.  Her experience included stints as a reporter at Dunn's Review, as a stock market reporter at USA Today, and as the financial news bureau chief in New York for the Baltimore Sun.  Antilla was also an adjunct professor at New York University, teaching business journalism in the graduate journalism department.

In the fall of 1994, Antilla learned of a rumor circulating on Wall Street concerning plaintiff-appellee Robert Howard ("Howard"), who was then the chairman of two publicly-traded companies, Presstek, Inc. and Howtek, Inc.  The substance of the rumor was that Howard was in fact Howard Finkelstein

("Finkelstein"), a convicted felon.  Finkelstein, who had been known to use the name Robert Howard as an alias, had prior convictions for securities fraud, violation of the White Slave Act, conspiracy to defraud, and interstate transportation of stolen property.

Antilla learned of the rumor from confidential sources whom she knew to be "short sellers" of Presstek stock.  "Short selling" is a transaction in which an investor borrows shares of stock, sells them, and later buys an equivalent amount of shares to return the borrowed shares.  The potential for profit in short selling lies in the possibility that the stock price will decline between the time the short seller sells the borrowed stock and the time he must purchase replacement shares to repay the borrowed stock.

Antilla perceived a newsworthy correlation between the circulation of the short sellers' "dual identity" rumor and recent fluctuations in the price of Presstek stock.  In order to generate a story on the topic, she investigated the rumor for over a month, interviewing roughly thirty people including Howard himself, Howard's son, and officials from the Securities and Exchange Commission ("SEC").

The article was published on October 27, 1994.  Headlined "Is Howard Really Finkelstein?  Money Rides on It," the article begins with the question "Is Robert Howard really Howard Finkelstein?  A lot of investors in Mr. Howard's Presstek Inc. would like to know.  But not even the Securities and Exchange

-3-

Commission can say for sure.  And the lingering mystery has roiled a hot stock and left the S.E.C. blushing."[1]

A significant portion of the article details Antilla's efforts to obtain confirmation of the rumor's truth or falsity from the SEC.  None of the three SEC officials with whom she spoke could definitively resolve the short sellers' rumor, in part because the agency had failed to input aliases into its computer record-keeping system.  However, one SEC official stated that the SEC's "records don't indicate that [Howard] is anyone [other than who he claims to be]."

The article goes on to report that Howard had unequivocally denied the rumor and, further, that Howard's son, Dr. Lawrence Howard, had supplied "extensive documents" to show both his father's addresses at various times and that Howard and Finkelstein had different birth dates.  However, the article also casts doubt on Dr. Howard's effort's to clear his father's name by noting his "reluctance . . . to be forthcoming about several questions."  In particular, the article recounts that, when asked to supply names of his father's children and stepchildren, Dr. Howard "would entertain the question only if first supplied with the names of Mr. Finkelstein's children and stepchildren." The article also states that Dr. Howard had declined to provide a full copy of testimony his father had given in a proceeding before the SEC earlier that year.

---

[1]  The full text of the article is set forth in the appendix to this opinion.

At the same time, the article also casts doubt on the credibility of short sellers who were pushing the rumor and who stood to profit from a decline in Presstek stock. For example, a separate side bar (under the headline "Wall St. Story: Jumbled Fact") detailed false information that the short sellers had provided to Antilla, including an erroneous report that Howard had earlier admitted to going by the name Finkelstein and a bogus tip that directory assistance gave the same telephone number for both Robert Howard and Howard Finkelstein.[2]

On the day of publication, lawyers for Howard met with senior management for The Times as well as Antilla. During that meeting Howard's representatives provided additional information, including passports not previously shown to Antilla, that corroborated Howard's denial of the rumor. Howard's representatives also disclosed that Howard would be returning to the United States from France to be fingerprinted by the SEC in order to conclusively refute the rumor.

That same day, Antilla received a phone call from Fred Newman ("Newman"), a lawyer who previously had represented Finkelstein. Before the article's publication, Antilla had tried to reach Newman unsuccessfully to obtain independent confirmation of the truth or falsity of the rumor.[3] Newman had not returned

---

[2] The full text of the side bar is also set forth in the appendix attached to this opinion.

[3] Antilla's article recounted the story of another lawyer who had represented Finkelstein. When supplied with a photograph of Howard, the lawyer said that, although he "couldn't swear to it," he thought the photograph depicted his former client. Yet another

Antilla's calls, but after reading the article he telephoned her to say that, based upon the picture of Howard in The Times, the men were not the same person.

Based upon the information provided by Howard's representatives during the October 27 meeting, Howard's willingness to be fingerprinted, and the information received from attorney Newman, The Times published a correction and a front page business section article on October 28, 1994, stating that it had found "no credible evidence" to support the rumor and expressing regret that the rumor had been published.[4]

The SEC continued to take no public position on the truth of the rumor until November 1, 1994, when, on the basis of a fingerprint analysis conducted by the FBI, the SEC formally announced that Howard is not Finkelstein.

Almost three years later Howard filed the present action, naming Antilla, but not The Times, as a defendant. Howard's complaint contained counts for negligent defamation, libel, and false light invasion of privacy. After determining at the summary judgment phase that Howard is a limited public figure, the district court pared Howard's claims down to defamation and false light, and the case proceeded to trial.

_____

lawyer who had previously represented Finkelstein was reported in the article as being unable to recall what his former client looked like.

[4]    The full text of the correction is also set forth in the appendix attached to this opinion.

At the end of the trial the jury returned a verdict in favor of Antilla on the defamation claim, but found in favor of Howard on the false light claim. The jury awarded Howard $480,000 in compensatory damages and nothing for "enhanced compensatory damages."[5] Despite the seeming inconsistency in the jury's verdict, Antilla made no objection prior to the discharge of the jury.[6] Instead, after the jury's discharge, she moved for judgment as a matter of law or, in the alternative, for a new trial or remitittur. The district court denied the motion, <u>Howard</u> v. <u>Antilla</u>, 160 F. Supp. 2d 169 (D.N.H. 2001), and Antilla's appeal of the false light verdict followed.

## II.

### A.

It is rare that the pedigree of a whole breed of common law tort claims can be traced with pinpoint accuracy. But in the case of common law claims for invasion of the right of privacy, most sources agree that the broad contours of these legal theories were first outlined by Samuel Warren and Louis Brandeis in the pages of the Harvard Law Review. <u>See</u> Samuel D. Warren & Louis D. Brandeis, <u>The Right to Privacy</u>, 4 Harv. L. Rev. 193 (1890); <u>see also</u> Harry Kalven, Jr., <u>Privacy in Tort Law -- Were Warren and</u>

---

[5] The parties stipulated at trial that Howard's damages were limited to the 66 days that followed the publication of the article.

[6] Nor did Antilla object to the use of a verdict form that would allow the jury find in favor of one party on the defamation claim, yet find in favor of the other party on false light.

<u>Brandeis Wrong?</u>, 31 Law & Contemp. Probs. 326, 327 (1966) (hailing Warren and Brandeis's article as the "most influential law review article of all"). Warren and Brandeis called generally for the recognition of an individual's legal right to control dissemination of information about himself when that information relates to nonpublic aspects of his life. <u>See</u> Warren & Brandeis, <u>supra</u>, at 214-16.

Later, as Warren and Brandeis's theories took root, Dean William Prosser distilled the amorphous legal protection of privacy into four distinct causes of action: (1) intrusion upon solitude; (2) public disclosure of embarrassing facts; (3) appropriation of an individual's name or likeness; and (4) publicly casting a person in a false light. <u>See</u> William Prosser, <u>Privacy</u>, 48 Cal. L. Rev. 383, 389 (1960). Dean Prosser's conception of the tort of false light invasion of privacy was ultimately accepted by the American Law Institute and set forth in the Restatement (Second) of Torts (1977) as follows:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
> (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

<u>Id.</u> § 652E.

The Restatement's formulation of false light has enjoyed a wide degree of acceptance. <u>See</u>, <u>e.g.</u>, <u>West</u> v. <u>Media Gen.</u>

Convergence, Inc., 53 S.W.3d 640, 644 (Tenn. 2001) (adopting Restatement (Second) of Torts § 652E and collecting cases from other jurisdictions that have done so). However, a number of jurisdictions have declined to recognize a common law cause of action for false light invasion of privacy, see id. at 644-45 (collecting cases), and scholarly critique of the tort has at times been sharp. See Diane L. Zimmerman, False Light Invasion of Privacy: The Light That Failed, 64 N.Y.U. L. Rev. 364, 435-51 (1989) (arguing that false light claims have an unwarranted chilling effect on free speech); J. Clark Kelso, False Light Privacy: A Requiem, 32 Santa Clara L. Rev. 783, 785 (1992) (claiming that "that there is not even a single good case in which false light can be clearly identified as adding anything distinctive to the law"). The New Hampshire Supreme Court has never explicitly recognized the viability of a claim for false light. For the purposes of this appeal, however, we accept the agreement of the parties, followed by the district court, that a common law claim for false light invasion of privacy can be sustained under the law of New Hampshire. Cf. Hamberger v. Eastman, 206 A.2d 239, 240-41 (N.H. 1964) (discussing favorably Dean Prosser's four categories of privacy-oriented tort claims). We pause, however, to note some important constitutional considerations that must inform our analysis in this case.

**B.**

Where a false light invasion of privacy action involves a public figure plaintiff and a media defendant, the federal

-9-

constitution imposes the same requirements that would apply to an analogous claim for defamation under New York Times Co. v. Sullivan, 376 U.S. 254 (1964), and its progeny.[7] See Time, Inc. v. Hill, 385 U.S. 374, 390-91 (1967); Veilleux v. Nat'l Broad. Co., 206 F.3d 92, 134 (1st Cir. 2000). Thus, only statements that are "provable as false" are actionable. Milkovich v. Lorain Journal Co., 497 U.S. 1, 19-20 (1990); Veilleux, 206 F.3d at 108. The plaintiff must also shoulder the burden of proving the falsity of each statement. Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 776 (1986). Moreover, the plaintiff must prove that the offending statement was made with "actual malice" -- that is, that the false statement was made intentionally or with reckless disregard as to whether it was false -- and proof of that element must be established by the quantum of "convincing clarity." Sullivan, 376 U.S. at 285-86.

The First Amendment concerns at stake in this case also engender a heightened level of scrutiny of the jury's verdict on appeal. See Veilleux, 206 F.3d at 106. In the ordinary case, we would review the evidence in the light most favorable to the prevailing plaintiff to determine if the evidence permits a reasonable jury to find in favor of the plaintiff on any permissible theory. See McMillan v. Mass. Soc'y for the Prevention of Cruelty to Animals, 140 F.3d 288, 299 (1st Cir. 1998). However, in cases raising First Amendment considerations, this court must

---

[7]    Howard does not challenge on appeal the district court's conclusion that he qualifies as a limited public figure.

-10-

conduct an "independent review of the evidence on the dispositive constitutional issue[s]." Bose Corp. v. Consumers Union, 466 U.S. 485, 508 (1984). Thus, "where the trial court is called upon to resolve a number of mixed fact/law matters which implicate core First Amendment concerns, our review, at least on these matters, is plenary . . . ." AIDS Action Comm. v. Mass. Bay Transp. Auth., 42 F.3d 1, 7 (1st Cir. 1994). Plenary review also extends, as it does in the ordinary case, to pure questions of law.[8] Daggett v. Comm'n on Governmental Ethics & Election Practices, 205 F.3d 445, 466 (1st Cir. 2000).

With these lessons in mind, we turn to Antilla's attack on the jury's false light verdict.

### III.

Antilla raises several arguments on appeal as to why the jury's false light verdict must be vacated or reversed. She argues first that the theory supporting the false light claim, as articulated by the district court, is constitutionally infirm. Second, she contends that Howard failed to adduce evidence sufficient to support the jury's finding of actual malice. Lastly, Antilla argues that the jury's award of damages was excessive and unsupported by the evidence.

---

[8] To be sure, independent review is subject to limitations and is not equivalent to de novo review of the entire record. For instance, "[p]urely factual determinations, particularly those involving the credibility of witnesses, remain best addressed by the factfinder, and are subject to the usual, more deferential standard of review." Veilleux, 206 F.3d at 107.

-11-

**A.**

In her post-trial motions, Antilla complained that the jury's false light verdict must be disregarded because, <u>inter alia</u>, it was inconsistent with the jury's rejection of Howard's defamation claim. The district court undertook to salvage the jury's finding in favor of the plaintiff on the false light claim as follows:

> The evidence fully supported the jury's conclusion that, while defendant might not have defamed Howard (i.e., implied that he <u>was</u> Finkelstein, an unsavory felon convicted of securities violations), she nevertheless did present him in an actionable false light (i.e., implied that he <u>could</u> be Finkelstein and that some facts tended to support that proposition). . . .
> . . . .
> Fairly considered, the evidence more than adequately supports a conclusion that, while the article might not convey the impression that Howard <u>is</u> Finkelstein (defendant says her article remained "'agnostic' about the truth of the rumor"), it certainly leaves the reader with the unmistakable impression that Howard <u>could be</u> Finkelstein -- that the "rumor" poses an open and reasonably debatable proposition . . . . [T]he article plainly implies that whether Howard is, in reality, Finkelstein is a reasonable, and as yet unresolved, question -- a factual mystery worth pondering.

<u>Howard</u>, 160 F. Supp. 2d at 174-75 (emphases in original).

Antilla now argues on appeal that the district court's theory of false light liability -- that the plaintiff may recover based on the article's false implication that Howard "might be" Finkelstein -- is constitutionally infirm because it entails no factual assertion that is "provable as false." <u>Milkovich</u>, 497 U.S. at 19-20; <u>Veilleux</u>, 206 F.3d at 108. As a prudential matter,

-12-

however, we think it unwise to entertain Antilla's challenge on these grounds.  Two principle factors lead us to this conclusion.

First, Antilla failed to raise her objection to the seemingly inconsistent verdict before the discharge of the jury. Under our precedent, it is well established that she thereby forfeited any right to challenge the inconsistency by way of a subsequent motion for new trial or motion for judgment as a matter of law.  See Campos-Orrego v. Rivera, 175 F.3d 89, 97-98 (1st Cir. 1999); Toucet v. Mar. Overseas Corp., 991 F.2d 5, 8 (1st Cir. 1993); Austin v. Lincoln Equip. Assocs., Inc., 888 F.2d 934, 939 (1st Cir. 1989); McIsaac v. Didriksen Fishing Corp., 809 F.2d 129, 134 (1st Cir. 1987); Merchant v. Ruhle, 740 F.2d 86, 91 (1st Cir. 1984); Fernández v. Chardón, 681 F.2d 42, 58 (1st Cir. 1982); Skillin v. Kimball, 643 F.2d 19, 20 (1st Cir. 1981).  This rule of forfeiture makes eminent sense:

> [T]he only efficient time to cure these possible problems of inconsistency would be after the jury announced the results of its deliberations and before it was excused . . . .  To allow a new trial after the objecting party failed to seek a proper remedy at the only possible time would undermine the incentives for efficient trial procedure and would allow the possible misuse of [the Federal Rules of Civil Procedure] . . . to implant a ground for appeal should the jury's opinion prove distasteful . . . .

Skillin, 643 F.2d at 19-20.  The inconsistency Antilla assailed in her post-trial motions should not have been a surprise.

Given the close (and frequently noted) similarity between claims of defamation and false light,[9] Antilla "should have observed that there could be no 'either-or.'" Merchant, 740 F.2d at 91. Since Antilla forfeited her opportunity to draw attention to, and perhaps cure, the inconsistency in a timely fashion, the district court's attempt to reconcile the jury's findings was essentially gratuitous. And we are not in the business of rendering opinions on hypothetical controversies, particularly ones of constitutional import.[10] See Maher v. Hyde, 272 F.3d 83, 86 (1st Cir. 2001) ("Federal courts do not issue advisory opinions.").

Second, in entertaining Antilla's challenge to the consistency of the verdict, the district court entered judgment on an entirely novel and untried theory of liability. "[A] defendant must be afforded both adequate notice of any claims asserted

---

[9]  Generally understood, a "false light privacy action differs from a defamation action in that the injury in privacy actions is mental distress from having been exposed to public view, while the injury in defamation actions is damage to reputation." Rinsley v. Brandt, 700 F.2d 1304, 1307 (10th Cir. 1983); accord Robert D. Sack, Libel, Slander, and Related Problems § 10.3, at 561-62 (2d ed. 1994); Bruce W. Sanford, Libel and Privacy § 11.4.4, at 579 (2d ed. Supp. 1999); William Prosser & Robert E. Keeton, Prosser and Keeton on Torts § 117, at 864 (5th ed. 1984). We have recognized other, less fundamental, distinctions as well. See Veilleux, 206 F.3d at 134-35 (noting that false light does not distinguish between oral and written words or between slander per se and slander per quod, and that false light contains an expanded publicity requirement).

[10]  To the extent Antilla's forfeited claim of inconsistency might still be reviewed for "plain error," see Smith v. KMart Corp., 177 F.3d 19, 28-29 (1st Cir. 1999), we find that the circumstances presented by this case are a far cry from satisfying that miserly standard. See Merchant, 740 F.2d at 89-90 (reasoning that "a number considerations" point to some tolerance of inconsistency in civil verdicts); cf. Davis v. Rennie, 264 F.3d 86, 100-01 (1st Cir. 2001) (noting that no known decision of this circuit has found plain error in a civil case).

-14-

against him and a meaningful opportunity to mount a defense." Rodríguez v. Doral Mortgage Co., 57 F.3d 1168, 1172 (1st Cir. 1995). To that end, "a district court may not enter judgment for a plaintiff on a cause of action that was . . . [not] raised during the course of trial." Id. at 1173. This principle has even stronger force in the context of a case involving significant First Amendment issues, given our obligation to ensure that "the judgment does not constitute a forbidden intrusion on the field of free expression." Bose Corp., 466 U.S. at 499 (quoting Sullivan, 376 U.S. at 285). In this case, the entire trial -- including the initial jury instructions, the opening statements, the parties' presentation of evidence and questioning of witnesses, the closing arguments, and the final jury instructions -- was predicated on the same theory of the case: that Antilla is liable for false light invasion of privacy because her article falsely implied that Howard is Finkelstein.[11] To enter judgment after the close of trial on an

_____

[11] The only suggestion that the false light claim could be premised on the implication that Howard might be Finkelstein can be found in the general allegations of Howard's amended complaint. Therein, Howard alleges the following: "The story meant and intended to convey that substantial questions are raised as to whether Presstek's chairman was in fact a convicted felon . . . thus creating a clear impression that money rides on the question which Antilla is unable to answer in Howard's favor." (emphasis added). However, the more specific allegations in Howard's complaint tend to characterize his false light claim as riding on the article's implication that Howard is Finkelstein. In particular, Howard alleged that the article "created a false implication that [Howard] and his company were to be avoided because of his sordid and disgusting past," and that the article "depicted [Howard] as someone or something which he is not." More importantly, even if the complaint flagged a theory of liability based on the implication that Howard might be Finkelstein at the earlier stages of litigation, the plaintiff simply failed to carry the theory through to trial.

-15-

imaginative but untried theory (<u>viz.</u>, that the article falsely implied that Howard "might be" Finkelstein) would run counter to important consideration of due process.

Since we conclude that a theory of false light recovery based on the article's implication that Howard "might be" Finkelstein is not properly before us, we decline to address its constitutional viability. We will therefore proceed to analyze Antilla's remaining arguments in the context of the false light theory that was actually presented to the jury -- namely, that Antilla's article falsely implied that Howard <u>is</u> Finkelstein and thereby placed him in highly offensive false light. We turn to those issues now.

**B.**

As noted earlier, the First Amendment requires that a false light plaintiff who qualifies as a public figure must prove by clear and convincing evidence that the offending false statement was made with "actual malice." Antilla argues that, as a matter of law, Howard's evidence at trial fell shy of this mark.

"The standard of actual malice is a daunting one." <u>McFarlane</u> v. <u>Esquire Magazine</u>, 74 F.3d 1296, 1308 (D.C. Cir. 1996). The plaintiff cannot succeed merely by demonstrating "an extreme departure from professional standards." <u>Harte-Hanks Communications, Inc.</u> v. <u>Connaughton</u>, 491 U.S. 657, 665 (1989). Instead, "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication," <u>St. Amant</u> v. <u>Thompson</u>, 390 U.S.

-16-

727, 731 (1968), or acted with a "high degree of awareness of . . . probable falsity." Garrison v. Louisiana, 379 U.S. 64, 74 (1964). The actual malice test thus mandates a subjective inquiry. See Connaughton, 491 U.S. at 687. And in a case such as this, where the plaintiff is claiming injury from an allegedly harmful implication arising from the defendant's article, "he must show with clear and convincing evidence that the defendant[] intended or knew of the implications that the plaintiff is attempting to draw . . . ." Saenz v. Playboy Enters., Inc., 841 F.2d 1309, 1318 (7th Cir. 1988); see also Robert D. Sack, Libel, Slander, and Related Problems § 5.5.1, at 5-64 (3d ed. 1999) ("[I]mplications perceived in a statement but not intended by the speaker cannot be actionable in public official or public figure cases."). As noted above, we are obliged to make a searching, independent review of the evidence supporting the jury's finding of actual malice. Bose Corp., 466 U.S. at 508; Veilleux, 206 F.3d at 106.

Turning to the article at the center of this dispute, we think it is questionable, even doubtful, that the article is actually capable of bearing the harmful implication charged by Howard -- namely, that he is Finkelstein. To be sure, the article repeats the short sellers' rumor that Howard is Finkelstein and proceeds to cast doubt on some of Howard's attempts to dispel the rumor. But read as a whole, the article points out flaws in both sides of the story and never places the author in a position of evaluating the truth or falsity of any party's account. In

-17-

Antilla's words, the article remained "agnostic" with respect to the truth of the short sellers' rumor.[12]

The evidence presented to the jury reveals that the "agnostic" tenor of the article was not accidental. As Antilla testified, her intent in writing the article was "to be clear that [she] didn't know the answer" to the question of Howard's true identity. During the editing process, Antilla's editors emphasized that the article must be clear that it takes no stand on the truth or falsity of the rumor and that the article should focus on the SEC's inability to resolve the rumor despite its role in policing the market.

There is no dispute that Antilla included certain facts tending to support the short sellers' story: Howard Finkelstein was a convicted felon who had, in fact, used the alias "Robert Howard,"

_____

[12] Although we decide this case on actual malice grounds, we think it is important to note that the article might also be nonactionable for the reasons set out in our recent decision in Riley v. Harr, No. 01-1648, slip op. at 8-12 (1st Cir. June 11, 2002), even if it could reasonably be read to constitute an implied assertion that Howard is Finkelstein. To the extent that Antilla offers a balanced account of the Howard/Finkelstein controversy -- reporting evidence consistent with the hypothesis that Howard is Finkelstein but also evidence tending to negate that hypothesis -- and does not imply that she is in possession of undisclosed facts indicating that Howard is Finkelstein, the article would probably qualify as protected expression under the First Amendment even if it did not remain agnostic as to Howard's true identity. See id. at 8-9 (a statement is nonactionable if "'it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts . . . .'" (quoting Gray v. St. Martin's Press, Inc., 221 F.3d 243, 248 (1st Cir. 2000)); Phantom Touring, Inc. v. Affiliated Publications, 953 F.2d 724, 729 (1st Cir. 1992) (a statement is nonactionable if "[t]he sum effect of the format, tone and entire content of the article[] is to make it unmistakably clear that [the author] was expressing a point of view only").

see United States v. Finkelstein, 526 F.2d 517 (2d Cir. 1975); the SEC was unable to confirm or deny the rumor; Dr. Howard's son was reluctant to provide Antilla with certain information; and Finkelstein's former lawyer stated that he thought a photo of Howard depicted his former client. Yet countervailing facts were also included. At Antilla's insistence the editors retained the sidebar that discredited some of the supposed proof short sellers had offered in support of their rumor. The article also makes explicit that the story concerning Howard was indeed a "rumor," and it discloses that short sellers have a keen interest in pushing the rumor "regardless of whether it is true" in order to drive the price of Presstek stock downward. Finally, the article discusses some of the documentation provided by Dr. Howard that showed that his father's date of birth differed from that of Finkelstein.

A somewhat analogous situation was presented in Medina v. Time, Inc., 439 F.2d 1129 (1st Cir. 1971) (per curiam). In Medina, the plaintiff sued a magazine for published statements of others concerning the plaintiff's supposed involvement in the My Lai massacre. Id. at 1129. In a brief opinion, this court held that the article, read as a whole, was an account of differing interpretations of the events that occurred at My Lai and that the article merely raised "questions . . . [concerning] the disparity of treatment as between [the plaintiff] and others rather than asserting the accuracy of the accounts published." Id. at 1130. As such, the article could not support a finding of actual malice. Id.

We also find valuable guidance in the decisions of our sister circuits. In Saenz, a public official sued the author and publisher of an article which allegedly implied that the plaintiff was involved in human rights violations. See 841 F.2d at 1311. Although the Seventh Circuit held that the article in question, while somewhat ambiguous, was capable of bearing the defamatory accusation alleged by the plaintiff, the court affirmed the district court's granting of summary judgment. The court concluded that the plaintiff failed to adduce sufficient evidence on the element of actual malice "primarily because, rather than demonstrating that [the author] or [publisher] intended to label him a torturer, the bulk of his evidence merely indicates that the defendants could not reasonably have concluded that he was a torturer." Id. at 1318 (emphasis supplied).

A similar lesson is found in Newton v. National Broadcasting Co., Inc., 930 F.2d 662 (9th Cir. 1990). There, the Ninth Circuit addressed a defamation claim by the entertainer Wayne Newton against a broadcasting company and several broadcast journalists after they aired a report about Newton's relationship with the Mafia and his purchase of a casino. Id. at 667. The trial court held that the story created the unmistakable impression that Newton, facing financial problems, called a Mafia friend who helped him fund his purchase of a casino in exchange for a hidden interest in the venture. Id. The trial court further held that even if the defendants "unintentionally left the impression" that Newton's purchase was funded in part by organized crime, they

-20-

"should have foreseen" that meaning would be communicated to others. Id. at 680. The Ninth Circuit reversed that finding and held that a defamatory implication that "should have been foreseen" by the defendants could not give rise to liability. Id. The court noted that the actual malice test is deliberately subjective. Id. Resort to an objective standard for actual malice, reasoned the court, "would permit liability to be imposed not only for what was not said but also for what was not intended to be said." Id. at 681.

Taken together, Medina, Saenz, and Newton demonstrate that Howard's attempt to build a case of actual malice for implications arising from Antilla's article must be doomed to fail. As in Medina, Antilla's article is essentially an account of two sides of an issue in which she merely raises questions concerning the authorities' treatment of the dispute. And in the same vein as both Saenz and Newton, the evidence before the jury in this case showed, at most, that Antilla should have foreseen the potential interpretation of her article as accusing Howard of being Finkelstein. But only a strained reading of the article itself would yield such an accusation. Thus, we think that Howard failed, as a matter of law, to meet his burden of proving that Antilla intended or knew that the article falsely accused Howard of being a known felon.

Relying on the Supreme Court's decisions in Connaughton and Hill, Howard argues that the jury could have found malice by clear and convincing evidence based on significant omissions of

-21-

fact in Antilla's article. In particular, Howard points to evidence at trial demonstrating that Antilla was in possession of a copy of Howard's passport, which showed that Howard was traveling abroad while Finkelstein was reported to be either in prison or out on bail pending sentencing for violations of federal securities law. Antilla's article does not include this information, which Howard argues would have clearly refuted the short sellers' rumor.

This evidence is certainly probative of subjective awareness of probable falsity. However, Antilla's omissions cannot carry the heavy freight of establishing actual malice by the measure of convincing clarity. In Connaughton, the newspaper used a single source as the basis for a highly improbable story that a candidate for judicial office had offered a bribe. Id. at 691-92. In addition, the author deliberately refused to listen to tape recordings that clearly exonerated the plaintiff of the accused wrongdoing. Id. at 692. Based on these facts, the Supreme Court upheld the jury's finding of actual malice. Id. at 693. Unlike the article's author in Connaughton, however, Antilla sought information regarding her story from upwards of thirty sources. She compared the rumors circulated by the short sellers with the information that Howard and his son were willing to divulge. She also sought independent confirmation of the facts from the SEC and lawyers that had previously represented Finkelstein. While Antilla was clearly stingy in providing facts from which a reader might infer that Howard was probably not Finkelstein, this is not enough

to sustain the conclusion that her article intentionally or reckless asserted that Howard was in fact Finkelstein.

Antilla admits that her failure to correlate the dates in Howard's passport with Finkelstein's jail time was an oversight, and concedes that she "should have seen it." However, she explains her failure to appreciate the significance of these facts by pointing to the 1500 pages of notes and documents in her investigative file. Howard argues that he introduced ample evidence (like a notation on the notes regarding Howard's passport dates showing Antilla knew Finkelstein was only released from prison in 1993) from which the jury could reasonably infer that the failure to include the exculpatory evidence was intentional, or at least reckless. However, as Antilla points out, the actual period of incarceration is set forth in a separate document. Thus, this is not a situation involving an obdurate refusal to listen to a clearly exculpatory tape, but, at worst, a negligent failure to connect the dots in a voluminous paper trail. Cf. Brown v. Hearst Corp., 54 F.3d 21, 25 (1st Cir. 1995) (in a defamation suit by a private plaintiff, finding no counterbalancing exculpatory evidence that was withheld that would support a claim of negligence).

Hill is also distinguishable. In Hill, the Supreme Court considered a statutory false-light action in which the plaintiff alleged that the defendants had falsely reported that a new Broadway play "re-enact[ed]" the plaintiff's family's experience in being held hostage by three escaped convicts. 385 U.S. at 376-77. Based on the defendants' awareness of the true facts surrounding

-23-

the plaintiff's experience, the Court ruled that the jury could reasonably conclude from the evidence in the case that the defendants had engaged in knowing falsehood or had recklessly disregarded the truth. Id. at 394. Hill, however, provides uncertain guidance in this case because it involved an invasion of privacy claim by a non-public figure. As the Court explained:

> We find applicable here the standard of knowing or reckless falsehood, not through blind application of New York Times Co. v. Sullivan, relating solely to libel actions by public officials, but only upon consideration of the factors which arise in the particular context of the application of the New York [invasion of privacy] statute in cases involving private individuals . . . . [A] different test might be required in [an invasion of privacy action] by a public official, as opposed to a libel action by a public official or a statutory action by a private individual . . . .

Id. at 390-91. Moreover, Hill involved a far more direct assertion by the defendants that a fictionalized story "re-enacted" events that actually occurred. This makes Hill a poor analog to the case before us, in which Antilla's article assumed only an ambivalent stance toward the truth or falsity of the allegedly harmful statement. Also, the plaintiff in Hill adduced an overwhelming amount of evidence that the defendants were aware of the falsity of their statement. In comparison, Howard's evidence of actual malice was relatively weak, and its force was diluted further by the undisputed fact that Antilla made efforts to include information in the article tending to discredit those who circulated the rumor.

In sum, based on our constitutionally-mandated independent review of the evidence on actual malice, we can

-24-

conclude only that, even if Antilla's article was capable of communicating the accusation that Howard is a convicted felon, such a false accusation was not shown to be either intentional or treated with reckless disregard. Thus, a verdict in Howard's favor cannot be supported.

## IV.

For the reasons stated above, we **vacate** the jury's verdict on the false light claim and **remand** the case to the district court with instructions that judgment be entered in favor of the defendant/appellant.

**A. ARTICLE**

**Is Howard Really Finkelstein?**
**Money Rides on It**

**By Susan Antilla**

Is Robert Howard really Howard Finkelstein? A lot of investors in Mr. Howard's Presstek Inc., would like to know. But not even the Securities and Exchange Commission can say for sure. And the lingering mystery has roiled a hot stock and left the S.E.C. blushing.

Investors count on the S.E.C. to weed out rogues in the universe of publicly traded companies, paying particular attention to repeat offenders. Sometimes, though, the agency slips up through bad record-keeping or incomplete research, inadvertently setting the backdrop for confusion in the markets. Unsuspecting investors in Presstek, run by its chairman, Robert Howard, no doubt wondered what had happened in early fall to stall a four-month rally in their stock. Presstek, a company that sells imaging technology to makers of printing presses, had reported no startling news that would explain the 16 percent plunge in the stock in September and the 13 percent fall that followed this month.

But behind the scenes, a rumor was sweeping the market that the chairman of Presstek had been concealing an ugly past. The story that made the rounds: Mr. Howard, founder of Presstek in 1987, was Howard Finkelstein, a convicted felon who went to jail for violations of securities laws, among other things.

Mr. Howard denies that he is Mr. Finkelstein, and the rumor should have been easy enough to confirm or quell, easing the anxiety of investors who did not know whether to buy, sell or sit tight. After all, the S.E.C. as recently as February settled an insider trading case against the Robert Howard who runs both Presstek and another public company

called Howtek, both in Hudson, N.H. The S.E.C. said Mr. Howard had given an illegal tip about Howtek's outlook to a friend on a golf course and had fined and censured him.

The S.E.C. did search its files for Mr. Howard but it did not find its own public announcements from the mid-1970's, including the one in 1976 that referred to the criminal conviction of "Howard Finkelstein (also known as Robert Howard)" for securities law violations.

"We did what we would normally do in checking records and checking our data base," said William McLucas, chief of the enforcement division of the S.E.C. in Washington. But the previous case against Howard Finkelstein alias Robert Howard "didn't pop up," Mr. McLucas conceded, explaining that it appeared that no one cross-referenced the alias of a convicted felon in the S.E.C.'s computerized records that date back to 1974.

"Would I have preferred we'd put the names in and flipped them in both instances?" Mr. McLucas asked. "Yes. But the names may not have been entered into the computer data base when the data was put into the system way back when."

While Mr. McLucas acknowledged there was a record-keeping problem in this case, he said he did not think that dual identities posed a serious problem for his enforcement unit.

Had S.E.C. employees systematically made two entries on every alias when the agency set up its computerized data base in 1984, the Howard/Finkelstein case would have come up. That would not have told the S.E.C. that the Presstek chairman was Mr. Finkelstein. But it may have raised investigators' suspicions, caused them to query Mr. Howard about the possible Finkelstein connection, and perhaps given them a reason to investigate further to determine who Robert Howard was. Lacking the computer entry of the alias, though, the agency never got to the first step.

The S.E.C. still cannot say whether the Robert Howard of Presstek is or is not the same

Robert Howard who operated as Howard Finkelstein.

"Our records don't indicate that he is anyone else," said Mr. McLucas, referring to the Presstek chairman. But "we have not at this point in time taken his fingerprints," he added.

The S.E.C. may not have found the previous case but the short-sellers did. Short-sellers, who profit by placing bets that a stock will decline, found out about the Finkelstein question and used the connection -- regardless of whether it is true -- to try to push the price lower. Their effort, and the fact that the S.E.C. was unaware of the identity issue at all, is what has made Presstek and Mr. Howard (and perhaps Mr. Finkelstein) a market story over the last several months.

The short-sellers did their own research on the heels of the February S.E.C. case, and discovered the other S.E.C. case that the S.E.C.'s own investigators missed. In that case "Howard Finkelstein, a.k.a. Robert Howard" had illegally swapped securities for fur coats in a scam in the late 1960's. Mr. Finkelstein alias Mr. Howard went to jail for that and other infractions, including a conviction for a violation of the Mann Act that prohibits transportation of women across state borders for immoral purposes.

Pushing the Finkelstein connection, the short-sellers apparently were able to worry investors enough to create selling of Presstek that pushed the price down on heavy volume from a peak of $48.75 a share on Sept. 13 to $41 a share on Sept. 23 and from $47.50 on Sept. 28 to $41 on Oct. 5. Yesterday, it closed at $41.25, down 75 cents.

Mr. Howard of Presstek vehemently denies that he is the Mr. Howard with the alias of Finkelstein. The rumor "is absolutely, unequivocally not true," he said in a recent telephone interview from his home in St. Jean-Cap-Ferrat, France. But some gaps in the Howard family's effort to prove this and the S.E.C.'s own uncertainty leave some doubt.

In pursuing its insider trading case against Mr. Howard earlier this year, the S.E.C. asked the Presstek chairman: "Are there any other names that you are known by besides Robert Howard?" according to two pages of the transcript supplied by Lawrence Howard, Mr. Howard's son. (The New York Times has asked for the entire transcript from the S.E.C., under the Freedom of Information Act. Robert Howard's lawyer, Larry Iason, has filed an objection to that request.) His answer, according to the pages supplied by Lawrence Howard: "Well, my name at birth was Robert Horowitz."

During a meeting last week in New York, Lawrence Howard supplied extensive documents to show his father's addresses at various times. His father's birth certificate shows a birth date of May 19, 1923, while court documents show that Mr. Finkelstein's birth date is April 23, 1929.

A telephone listing in Winter Park, Fla., Mr. Finkelstein's last known address, was unpublished. One lawyer who represented him in a 1974 stock fraud case said he would not be able to remember what his client looked like. Supplied with a photograph of Mr. Howard of Presstek, another lawyer for Mr. Finkelstein said he "couldn't swear to it," but thought it was his former client.

Several prosecutors from the securities case in the 1970's said they could not remember details about Mr. Finkelstein. A gynecologist who wrote a letter to a judge defending Mr. Finkelstein could not be found. Other questions also remain. Not the least of which have to do with the reluctance of Lawrence Howard to be forthcoming about several questions.

Asked to supply names of his father's children and stepchildren, for example, Lawrence Howard would entertain the question only if first supplied with the names of Mr. Finkelstein's children and stepchildren. Asked for a full copy of his father's S.E.C. testimony, Lawrence Howard declined.

Lawrence Howard, a psychiatrist who was formerly president of Presstek, is now a vice chairman. Three months ago, he joined Whale Securities in New York, working in its corporate finance department. Whale, which was fined by the National Association of Securities Dealers in 1992 for excessive markups of a stock it had taken public, was the underwriter for both Howtek and Presstek.

Robert Howard, meanwhile, carries baggage that would be of interest to shareholders and would have been ammunition for short-sellers even if it was clear that Robert Howard was not Howard Finkelstein.

In 1967, Mr. Howard founded a personal computer printer company whose shares soared, then plunged, before he sold the company and resigned. Two gambling ventures have gone under, the last in 1981.

In more recent history, earnings per share at Presstek plunged last year to 17 cents from 63 cents in 1992. Last October, James L. Bast resigned as president and chief executive after only four months, raising the question of who is minding the company store.

In the absence of an airtight record-keeping system at the S.E.C. this type of identity confusion could happen again. And that is apart from other ways in which unscrupulous operators can deceive the agency. An article in Business Week magazine last month chronicled the checkered history of a chief executive who had a sex-change operation. The S.E.C. censured the executive twice for violations of securities rules -- once when she was a man and again after the operation.

When the S.E.C. censured the executive in 1991, it was the first case by the agency against Eleanor Schuler, but the second against John Huminik Jr., whose sex-change operation was chronicled in People magazine in 1979. Mr. McLucas said there were limits to what the S.E.C. could reasonably be expected to do in investigations.

"I'm not sure what else the Government can do in civil investigations where we take

thousands of witnesses a year," Mr. McLucas said. "Do you throw them down and say 'tell the truth or we'll throw the hot light on you?' Rubber hoses went out years ago -- the Constitution doesn't let you do those things anymore."

As for the Presstek chairman, will the S.E.C. be investigating further to get the right information out to the public markets? "I'm not going to say what we may or may not do at this point," he said.

**B.  SIDE BAR**

**Wall St. Story: Jumbled Fact**

Short-sellers are frequently a much-needed balance in the markets, debunking some of the hype on public companies. But sometimes they go too far.

One short-seller promoting the story on Wall Street that Robert Howard is Howard Finkelstein, who spoke on the condition of anonymity, said he had a copy of S.E.C. testimony in which Mr. Howard, the Presstek chairman, admitted to going by the last name of Finkelstein. (In fact, Mr. Howard told the S.E.C. his original last name was Horowitz.) The short-seller also said that directory assistance in Hudson, N.J., was giving out the same telephone number for both Howard Finkelstein and Robert Howard. Not only that, he said, but calls to that number for Finkelstein were forwarded to Howtek, one of Mr. Howard's two companies.

But there is no city called Hudson in New Jersey. And Howtek and Presstek are headquartered in Hudson, N.H., where there is no listing for a Howard Finkelstein.

**C.  CORRECTION**

An article in Business Day yesterday discussed rumors affecting the stock of Presstek, an imaging technology company. The rumors suggested that Presstek's chairman, Robert Howard, might actually be Howard Finkelstein, a convicted felon.

Mr. Howard's lawyers presented The Times yesterday with documents and other information regarding his identity. After inspecting them, The Times finds no credible evidence to support the rumor. Details appear today on page D1.

The Times regrets having printed the rumor.