DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**MICHAEL D. BLACK, MD, MBA,**
Appellant,

v.

**CABLE NEWS NETWORK, INC.,** et al.,
Appellees.

Nos. 4D2023-1257, 4D2024-0447 and 4D2024-1349

[September 10, 2025]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Richard L. Oftedal, Senior Judge; L.T. Case No. 502016CA001517XXXXMB.

Thomas A. Clare, P.C., Elizabeth M. Locke, P.C., Joseph R. Oliveri and Jered T. Ede of Clare Locke LLP, Alexandria, Virginia, for appellant.

Charles D. Tobin and Paul J. Safier of Ballard Spahr LLP, Washington, DC, and L. Martin Reeder, Jr. of Atherton Galardi Mullen & Reeder PLLC, West Palm Beach, for appellees.

KUNTZ, C.J.

After CNN.com published a story about "surgeries gone wrong" at St. Mary's Hospital, CNN's *Anderson Cooper 360°*, a television program anchored by Anderson Cooper reported on "secret deaths" at the hospital. Cooper told his audience that these secret deaths stemmed from the surgeon leading the program, Dr. Michael D. Black, failing to conduct the surgeries safely. Cooper even asked why Dr. Black was allowed to continue operating.

As a result of those reports, Dr. Black filed a defamation lawsuit against the defendants, Cable News Network, Inc., Elizabeth Cohen, John Bonifield, Cooper, and Dana Ford. After we held Dr. Black's allegations did not support a punitive damages claim, *see CNN, Inc. v. Black*, 374 So.

3d 811 (Fla. 4th DCA 2023),[1] the circuit court granted summary judgment for the defendants on the substance of Dr. Black's claims.

A jury may ultimately find the defendants did not defame Dr. Black. But at this point in the proceedings, we conclude Dr. Black has presented sufficient evidence to survive the defendants' summary judgment motion. Therefore, we partially reverse the summary judgments and remand for further proceedings.[2]  Because of our reversal of the underlying summary judgments, we also reverse the circuit court's cost judgment.

## Background

### i.    *CNN's Prior Reporting*

In 2013, CNN.com published an article by Cohen and Bonifield on a Kentucky hospital's pediatric surgery center.  They reported that the hospital had refused to publish the mortality rates for its pediatric cardiothoracic surgery program, which led some parents to believe "something at the hospital has gone terribly wrong."

After the article's publication, the hospital issued a press release stating that its program's mortality rate was 5.8%, comparable to the national rate of 5.3% for similarly sized programs.

Cohen authored a follow-up article for CNN.com acknowledging this figure.  The article also quoted expert sources who said the program's "overall mortality rate" was inadequate to evaluate the program because it did not consider the complexity of procedures performed.  One expert, Dr. Jeffrey Jacobs, was quoted in the article as stating:

> The mixture of operations performed at various pediatric cardiac surgery programs can vary substantially . . . .  Consequently, programmatic performance cannot be properly

---

[1] In the first published opinion arising from this dispute, we denied a petition for writ of certiorari seeking to quash the circuit court's order compelling production of emails and texts between CNN and the defendant employees. *CNN, Inc. v. Black,* 308 So. 3d 997 (Fla. 4th DCA 2020).

[2] The record indicates appellee Dana Ford had "contributed" to a CNN article posted to CNN.com after St. Mary's had closed the pediatric cardiothoracic surgery program.  Ford allegedly had relied upon information from CNN's previous reporting and St. Mary's responsive press releases.  She testified that "[t]here were no corrections or flags" on CNN's previous reporting to indicate the reporting had been inaccurate.  Based on the summary judgment evidence, we affirm the circuit court's judgment as to Ford.

2

assessed by comparison of overall unadjusted rates of mortality. The quality of care of a given program is best assessed by benchmarking specific risk adjusted outcomes to national aggregate data . . . . Only then is it possible to truly assess the quality of care of a given program.

While Cohen was working on her reporting, Dr. Jacobs emailed her that "raw" mortality rates without adjustment for case mix were "essentially meaningless." Cohen later testified that "Dr. Jacobs and others said this to me over and over again," because cardiologists trusted some hospitals with "a very difficult caseload . . . ."

### ii. The Investigation of St. Mary's Program

Cohen and Bonifield began investigating St. Mary's pediatric cardiothoracic surgery program in 2014. They assessed various sources for their reporting, including interviews with parents of babies treated at the facility, death certificates, public records, records which St. Mary's had submitted to the State of Florida, and court documents. They also reviewed medical studies and consulted experts in the medical community.

They again consulted Dr. Jacobs, the same expert who had warned them against the use of raw mortality rates when they investigated the Kentucky hospital. He answered "[t]housands" of Cohen's questions about pediatric cardiothoracic surgery. He also provided Cohen with the Society for Thoracic Surgeons' national raw mortality rate for pediatric open-heart surgeries, which was 3.3%.

Cohen and Bonifield reached out to a St. Mary's spokesperson for the program's yearly data regarding its number of operations and procedure outcomes. The spokesperson responded that this data was not publicly available and not standard practice to disclose. Cohen and Bonifield testified that they repeatedly requested this data from St. Mary's, but St. Mary's would not provide it.

Cohen and Bonifield later emailed the spokesperson that they had calculated the "program's mortality rate" as 12.5%—using the hospital's state filings, they had determined the program had performed surgeries on 48 patients between 2011 and 2013, and six of those patients had died. St. Mary's CEO sent a letter in response, informing Cohen and Bonifield that their data was "inaccurate" because it "does not represent all cases and/or procedures performed as part of the program." The CEO's letter also stated that St. Mary's, "[l]ike many programs across the country, . . .

do[es] not provide raw mortality data because such data does not give proper context for the complexity and severity of each case, which could potentially lead to providing misleading information to consumers." Instead, the letter continued, St. Mary's submitted data to STS who, based on that data, gave St. Mary's "a two star ranking," the same ranking STS gave "nearly two-thirds of similar programs in the United States." Beyond providing that "ranking," St. Mary's response did not include any other data regarding the program's volume or mortality rates.

### iii.   The CNN.com Story About St. Mary's

On June 1, 2015, CNN.com published an article written by Cohen and Bonifield on the program, titled "Secret Deaths: CNN Uncovers High Surgical Death Rate for Children at a Florida Hospital." The article used the "raw" mortality rate which Cohen and Bonifield had shared with St. Mary's. The article stated that St. Mary's pediatric cardiothoracic surgery program had performed 48 open heart surgeries on children and babies from 2011 to 2013, and CNN had independently determined that six infant patients died. The article claimed that, by dividing the number of deaths by the number of surgeries, CNN "was able to calculate [the program's] death rate for open heart surgeries as 12.5%, more than three times the national average of 3.3% cited by the Society for Thoracic Surgeons." The article described this death rate as "shocking."

The article further asserted that St. Mary's kept its death rate "secret" because it did not publicly report its mortality rate or provide mortality figures to CNN. The article included the quote from St. Mary's CEO that CNN's raw mortality data "does not give proper context for the complexity and severity of each case, which could potentially lead to providing misleading information to consumers." The article stated that "St. Mary's . . . says CNN is wrong about the program's death rate, but refuses to say what it considers to be the right death rate."

Parents of children who had died or were severely disabled after undergoing open-heart surgeries performed by Dr. Black at St. Mary's were interviewed and quoted in the CNN article. Several parents claimed they had been misled regarding the surgeries' risks. One parent was quoted as saying, "[t]here is no room for institutions that are lying to families to get them to offer up their babies as sacrificial lambs." CNN placed graphic images of those children undergoing treatment throughout the article.

Cohen and Bonifield also stated that others had questioned the program's performance. They noted that "a well-respected pediatric heart doctor" had submitted a letter to the Florida Department of Health

4

detailing his concerns about St. Mary's program.  They also cited a Florida Cardiac Technical Advisory Panel report that concluded St. Mary's lacked the resources to perform vital tests and services for pediatric heart patients.  One CTAP panel member also concluded the program was performing too few surgeries to develop the requisite level of competence and expertise.  CTAP therefore recommended the hospital stop performing complex surgeries on children.

### iv.  Anderson Cooper Reports on the St. Mary's Story

Also on June 1, CNN ran a news report, "The Hospital with a Serious Heart Problem," on *Anderson Cooper 360°*, a television program hosted by Cooper.  Cooper began the broadcast teasing the upcoming segment on the program, stating that "our reporting reveal[ed]" that the program was not performing surgeries on babies "safely," and that, as a result, babies were "dying or suffering life-changing complications . . . ."  When Cooper introduced the segment, he stated that CNN's reporting "focuses on pediatric open-heart surgeries going terribly wrong," and that parents "want to know . . . why the [program] is still permitted to continue."  The segment also included various graphics linked by the consistent theme of "SECRET DEATHS":



Cohen then narrated the segment.  She stated that St. Mary's "keeps its death rate a secret," but she and Bonifield were able to calculate it using documents submitted to the State:

According to the documents CNN obtained from the state, from 2011 to 2013, [St. Mary's] performed 48 open heart surgeries on children and babies. Independently, CNN determined that six infants died, and confirmed the deaths with parents of all six children. From those numbers, CNN was able to calculate the death rate for open heart surgeries as 12.5%, more than three times the national average of 3.3% cited by [STS].

At the end of the report, Cooper briefly interviewed Cohen and complimented her for the "incredible story."

### v. CNN's Follow-Up Reports

Two days after airing the initial report, CNN.com published a follow-up article with a "disturbing development": another baby who had surgery at the St. Mary's program had died on June 2. CNN again reported that program had a "12.5% mortality rate for open heart surgeries" from 2011 to 2013, "which is more than three times the national average." And the reporting again noted that St. Mary's "says CNN did not get the mortality rate right, but won't say what [it] believes the correct rate is."

AC360 aired a follow-up segment that night, as well. Cooper stated that "[b]etween 2011 and 2013, [the St. Mary's program's] death rate for open heart surgeries on babies was more than three times the national average . . . according to our calculations." Cooper introduced another video which Cohen narrated and repeated this assertion.

AC360 reported on the St. Mary's program yet again only two days later. Cooper interviewed Cohen, who stated that the U.S. Center for Medicare and Medicaid Services was "launching an investigation into the information that is in our story." Cohen stated that a federal official told her this was a "serious situation" and the government "want[s] to make sure that people are not unnecessarily exposed to harm."

### vi. St. Mary's Response

About a week after CNN's initial coverage, CNN reported St. Mary's announced it had suspended elective pediatric heart surgeries and would conduct a "comprehensive review" of the program. But St. Mary's criticized the "exaggerated" and "inaccurate" mortality rate which CNN had calculated, stating the "flawed analysis . . . mischaracterizes program performance." St. Mary's contended that its program's risk-adjusted mortality rate for the four-year period ending on June 30, 2014, was 5.3%.

6

CNN noted that St. Mary's press release did not include any additional "raw data" underpinning this figure.

Nearly a month later, CNN published a follow-up article discussing the differences between raw and risk-adjusted mortality rates to "help readers better understand" CNN's reporting. Again, the article noted that St. Mary's "doesn't say" how it had arrived at that 5.3% figure.

### vii. The Lawsuit

Dr. Black brought defamation claims against CNN and its employees named above. He alleged the various defendants had defamed him in eighteen separate publications by repeatedly asserting that his pediatric cardiothoracic surgical mortality rate was more than three times the national average, which also implied he was an incompetent surgeon.

After almost six years of litigation, Dr. Black moved the circuit court for leave to seek punitive damages. He proffered what he described as substantial evidence to indicate the defendants knew the calculated mortality rate which they had advanced was "meaningless." Still, the defendants published the rate anyway without other "relevant information" so they could "pursue a preconceived narrative . . . ."

The circuit court granted Dr. Black's punitive damages motion, but we reversed. *See Black*, 374 So. 3d at 812. We concluded that Dr. Black had not proffered a reasonable evidentiary basis to establish actual malice. *See id.* at 818-19. Although we held that he could seek to recover only his actual damages and not punitive damages, we expressed no opinion on the merits of his defamation claims. *See id.* at 812, 819.

Shortly after we issued our punitive damages opinion, the circuit court considered the defendants' summary judgment motion. The defendants argued that Dr. Black could not prove CNN's reporting was false because CNN's calculated mortality rate was accurate, and CNN's conclusions based on that calculated rate were protected opinion. As to Cooper and Ford, the defendants argued that neither had acted with fault because neither had played any role in investigating, vetting, or editing CNN's reporting on the St. Mary's program. Instead, they had relied on CNN's editorial review process.

After an all-day hearing on the motion, the circuit court ultimately granted summary judgment for all defendants.[3]

## Analysis

We review orders granting summary judgment de novo. *Serrano v. Dickinson*, 363 So. 3d 162, 165 (Fla. 4th DCA 2023). The standard requires us to determine whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *In re Amends. to Fla. Rule of Civ. Proc. 1.510*, 317 So. 3d 72, 75 (Fla. 2021) (internal citations omitted).

A claim of defamation requires the following five elements: (1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory. *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008).

We have the benefit of an expanded record in this appeal, but the main issue is the same as it was in the punitive damages appeal and relates to CNN's use of raw morality rate. Dr. Black does not contend that CNN's calculated mortality rate was, in and of itself, "false." Rather, he argues that rate is "meaningless," because a pediatric cardiac surgery program can only be assessed using risk-adjusted data. He asserts CNN and its employees therefore used "meaningless" data to portray Dr. Black as an unsafe doctor who had caused an outsized number of deaths and life-changing complications in his patients.

The value of raw mortality rates as an evaluative tool appears, at best, ambiguous. One expert witness testified in this case that using risk-adjusted data was "desirab[le]," and "[r]aw comparisons of outcomes can be misleading," but raw mortality rates were a "starting point" which could suggest a program had "a problem." Another expert testified that the raw data would not always "fairly reflect the quality of [a] program and [its] operations . . . ." Yet another testified that raw data was not "meaningful" without also considering a surgical program's case mix. And Dr. Jacobs—who told Cohen and Bonifield that raw mortality rates were "essentially meaningless" in their earlier reporting of the Kentucky hospital—testified it was appropriate to rely on raw data in the absence of risk-adjusted data if "contextualized properly and used carefully."

---

[3] The circuit court had granted summary judgment for Cooper and Ford before we issued the punitive damages opinion.

CNN argues that it had asked St. Mary's for the adjusted data and St. Mary's refused to provide it. Dr. Black counters that St. Mary's did provide the requested data in the form of the program's two-star ranking from STS, but CNN "just ignored" it. CNN replies St. Mary's merely provided the defendants with the phrase "two-star ranking." But it is possible St. Mary's did not provide the adjusted data because Cohen and Bonifield did not specifically ask for it. In a text to Bonifield, Cohen asked, "I know we never specifically asked for risk adjusted data, but did we ever ask for anything general like for ex[ample] to see their STS report?" Bonifield answered, "No."

In any event, the circuit court held that CNN's use of raw data, rather than risk-adjusted data, was a nonactionable dispute over methodology, citing *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490 (2d Cir. 2013). In *ONY*, the Second Circuit held that "to the extent a speaker or author draws conclusions from non-fraudulent data, based on accurate descriptions of the data and methodology underlying those conclusions, on subjects about which there is legitimate ongoing scientific disagreement, those statements are not grounds for a claim . . . ." *Id.* at 498.

*ONY* is distinguishable from this case. The Second Circuit's holding applied to statements "presented in publications directed to the relevant scientific community, ideally in peer-reviewed academic journals . . . ." *Id.* at 497-98. That way, "the validity of the authors' conclusions may be assessed on their face by other members of the relevant discipline or specialty." *Id.* at 498-99. Reporting published on CNN.com and *Anderson Cooper 360°* is not directed to the scientific community of pediatric and congenital heart surgeons. And beyond that key distinction, *ONY* concerned false advertising claims under the Lanham Act, not defamation claims under state law.

Several cases cited by Dr. Black are more persuasive. In one case, the court held that "[a] misrepresentation of the mortality rate for a doctor can be sufficient to support a defamation claim." *Topper v. Midwest Div., Inc.*, 306 S.W.3d 117, 129 (Mo. Ct. App. 2010). There, the court held that the evidence of publication of an incorrect mortality rate could support a doctor's defamation claim. *Id.*

In another case, the Supreme Court of Texas explained why publication of raw (instead of risk-adjusted) mortality rates might support a surgeon's defamation claim:

9

Patient statistics matter to surgeons and hospitals, who understand what they both do and do not show. A more skilled cardiovascular surgeon may have a higher patient mortality rate than a less skilled surgeon only because of the higher difficulty of surgeries the skilled surgeon takes on. Healthier patients may have better surgical outcomes than those with other health issues. A flawed data sample that fails to take these and other factors into account can produce skewed results that do not accurately reflect a surgeon's quality of care. Surgeons and hospitals know this. [STS] adjusts the raw data that it compiles for seven risk-adjusted procedures so as not to compare surgical apples and oranges. Due to concerns over sample variations, STS does not create any type of surgeon-specific mortality rate. The resulting database is a highly valuable resource for hospitals that raw data cannot serve.

*Mem'l Hermann Health Sys. v. Gomez*, 649 S.W.3d 415, 418-19 (Tex. 2022).[4]

Based on the summary judgment record, we believe a trial on the merits is required to decide whether CNN's use of a calculated, raw mortality rate to imply babies were dying because of Dr. Black is sufficient to satisfy a defamation claim. We also agree the circuit court erred when it entered summary judgment on Dr. Black's defamation-by-implication claims. Statements that are not false can be defamatory when they create a false impression. *See Jews for Jesus*, 997 So. 2d at 1106. Dr. Black's defamation-by-implication claims should proceed to a trial on the merits as well.

### *Conclusion*

We express no opinion on the merits of Dr. Black's claim. But Dr. Black presented evidence alleging CNN and its employees published a story implying Dr. Black's allegedly deficient performance caused babies to die. The evidence is such that a reasonable jury could return a verdict for Dr. Black. We affirm the circuit court's summary judgment in favor of Ford, reverse the summary judgments in favor of defendants CNN, Cohen, Bonifield, and Cooper, and remand to the circuit court for further

---

[4] In that case, after a jury trial, the Supreme Court of Texas ultimately concluded that the offending statement was not published—not a disputed issue here. *See Gomez*, 649 S.W.3d at 426.

proceedings consistent with this opinion.  Finally, in light of our reversal of the summary judgments, we reverse the costs judgment.

*Affirmed in part, reversed in part, and remanded for further proceedings.*

LEVINE, J., concurs.
FORST, J., concurs with opinion.

FORST, J., concurring.

I concur with respect to the reversal of Case Number 4D2024-0447, the summary judgment in favor of CNN, Cohen, and Bonifield.  Mark Twain publicized the statement (the source of which is disputed): "There are three kinds of lies: lies, damned lies, and statistics."  That quote provides a good description of Appellant Black's case against the defendants—they allegedly published stories (online and via the Anderson Cooper 360° television program), knowingly or with reckless disregard for the truth, defaming Black and his pediatric cardiothoracic surgery program by manipulating statistics to give a misleading description of the program's performance.  There is an innate danger in basing conclusory judgments on a small sample size, and genuine issues of material fact remain unresolved at this point in the litigation (notwithstanding the fact that Black's complaint was filed in 2016).  I agree with a reversal of the summary judgment in 4D2024-0447 and a remand for further proceedings.

I also agree with a reversal and remand of Case Number 4D2023-1257 with respect to defendant/appellee Anderson Cooper.  I agree in general with Cooper's argument that a reporter that is merely reading copy prepared by others and "vetted" by a reputable review process should be shielded from liability for defamation.  I further agree with Cooper (and co-defendant Ford) that an argument "that every journalist within a news organization who touches a story in any capacity, no matter how minimally, is required to independently verify its accuracy, rather than trusting in the work of those colleagues tasked with that responsibility—finds no support in the record of this case, in the law, or in basic common sense about workflow in a multi-platform, 24/7, international news organization like CNN."

What needs to be resolved on remand with respect to Cooper is whether his role on the three *Anderson Cooper 360°* programs that are a subject of Black's complaint was limited to "reporter," or whether he also was a producer on any of those programs.  If the trial court finds Cooper was not a producer on any of these episodes, did not play any significant role in

the investigating, editing, or vetting of the alleged defamatory claims, and was merely reading and relying upon "vetted" copy, summary judgment would be appropriate.

Finally, I agree with the affirmance of summary judgment in Case Number 4D2023-1257 entered for defendant/appellee Dana Ford. Ford's draft website article was "ran . . . by" Cohen, Bonifield, and CNN's editorial department ("the Row"). Although Ford's draft apparently included the statement that the pediatric cardiothoracic surgery program's mortality rate was more than three times the national average, Ford testified that she did not have any involvement with CNN's other reports on the program and included the statement about the program's mortality rate because it had come from "previously reported and vetted CNN information." The trial court properly entered summary judgment as to Ford based on the conclusion she was merely a "republisher[] of information already vetted by CNN," and [was] entitled to rely on the "journalistic efforts of those original news gatherers and editorial reviewers." *See Nix v. ESPN, Inc.*, 772 F. App'x 807 (11th Cir. 2019).[5]

\* \* \*

***Not final until disposition of timely filed motion for rehearing.***

---

[5] "[W]hen one news agency republishes the content of a news story that was originally published by another reputable news agency or source, the republisher will not be liable if they relied on the research of the original publisher, absent a showing that the republisher had, or should have had, substantial reasons to question the accuracy of the articles or the *bona fides* of [the] reporter." *Nix* at 813 (internal quotations omitted).